Filed 11/22/24  In re Davion M. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re DAVION M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>DAVION M.,<br><br>　　　Defendant and Appellant. | A167516<br><br>(Solano County<br>Super. Ct. No. J4322302) |

On February 12, 2021, Fairfield police were called to the scene of a shooting incident at a parking lot, where a man had been shot and killed while sitting in a car with his girlfriend.  During the investigation that followed, police identified three suspects, including Davion M., a 17-year-old minor who was the suspected shooter.  Based on their investigation, officers believed the assailants knew the victim was in possession of a large quantity of drugs and cash and set him up to be robbed.

In April 2021, the People filed a petition alleging that Davion comes within the jurisdiction of the juvenile court due to his commission of a murder.  (Welf. & Inst. Code, § 602; undesignated statutory references are to this code.)  In March 2023, the juvenile court granted the People's motion to

1

transfer Davion to a court of criminal jurisdiction.  (§ 707.)  On appeal, Davion contends the order is not supported by sufficient evidence, and the juvenile court failed to provide reasons to justify its ruling.  We affirm.

## STATUTORY OVERVIEW

### *Current Standards For Deciding Transfer Motions*

If a minor is alleged to fall within the juvenile court's jurisdiction under section 602 due to the minor's commission of a felony while he or she was 16 or older, the People may file a motion to transfer the minor from juvenile court to a court of criminal jurisdiction.  (§ 707, subds. (a)(1), (b).)  "In order to find that the minor should be transferred," the court "shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (§ 707, subd. (a)(3) (§ 707(a)(3)).)

Section 707(a)(3) sets forth five "criteria" the court "shall" consider in making its decision:  the minor's criminal sophistication; whether the minor can be rehabilitated "prior to the expiration" of the court's jurisdiction; the minor's previous delinquent history; the success of prior attempts to rehabilitate the minor; and the "circumstances and gravity" of the offense the minor is alleged to have committed.  (§ 707(a)(3)(A)–(E); see *In re J.S.* (2024) 105 Cal.App.5th 205, 212 [court "must" consider section 707(a)(3) criteria].)  In considering each of these criteria, the court "shall give weight to any relevant factor," and the statute incorporates a non-exclusive list of relevant factors.  (§ 707(a)(3)(A)–(E).)  If the court orders a transfer to adult court, it "shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (§ 707(a)(3).)

2

*2023 Amendments*

The current standards for adjudicating a transfer motion reflect amendments to section 707(a)(3) that went into effect January 1, 2023 (Stats. 2022, ch. 330, § 1 (the 2023 amendments)). As the order transferring Davion's case to adult criminal court was made a few months later, we highlight three material changes effectuated by the 2023 amendments.

First, "[u]nder the amended statute the ultimate finding is whether the minor is amenable to rehabilitation while under the jurisdiction of the juvenile court." (*In re E.P.* (2023) 89 Cal.App.5th 409, 416 (*E.P.*).) Before and after the 2023 amendments, the issue whether rehabilitation can be achieved prior to expiration of juvenile jurisdiction over the minor has been one of the five statutory criteria the court must consider. (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164, 165–167 (*Miguel R.*).) But section 707 did not previously require the court to determine whether the minor is amenable to rehabilitation within the juvenile system. (*Miguel R.* at pp. 164, 165–167; *In re S.S.* (2023) 89 Cal.App.5th 1277, 1284 (*S.S.*).) This ultimate finding, required under the amended statute, "concerns a global assessment of the minor's suitability to rehabilitation within the juvenile court system, and not just a comparison of the time needed with the time remaining." (*Miguel R.*, at p. 167.)

Second, the 2023 amendments place the burden on the People to establish by clear and convincing evidence that the minor is not suitable for rehabilitation in the juvenile court. (Stats. 2022, ch. 330, § 1; § 707(a)(3).) Prior to these amendments, former section 707 and its corresponding Rule of Court required the prosecution to establish by a preponderance of the evidence that the minor should be transferred to criminal court. (*S.S.*, *supra*, 89 Cal.App.5th at p. 1286; *E.P.*, *supra*, 89 Cal.App.5th at p. 416.) The clear

3

and convincing standard " 'demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt.' " (*S.S.*, at p. 1286.)

Third, the 2023 amendments added a requirement that the juvenile court must state the reasons supporting its finding that the minor is not amenable to rehabilitation in the juvenile system, whereas the previous version of section 707 required only that the court state the basis for its decision. (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164; *S.S.*, *supra*, 89 Cal.App.5th at p. 1294; *E.P.*, *supra*, 89 Cal.App.5th at p. 416.)

"Taken together, [these] changes to section 707 refocus juvenile courts on minors' amenability to rehabilitation." (*S.S.*, *supra*, 89 Cal.App.5th at p. 1288.) The 2023 amendments require the court to consider all five statutory criteria together in order to make this determination. (*E.P.*, *supra*, 89 Cal.App.5th at p. 417; *Miguel R*, *supra*, 100 Cal.App.5th at p. 167.) Importantly though, section 707 "does not require that any of those criteria be afforded any greater weight than any other." (*Miguel R.*, at p. 167.) The court has discretion to conclude that one or more criteria "predominate so as to determine the result," even if other criterion point in a different direction. (*E.P.*, at p. 417.)

## FACTUAL AND PROCEDURAL BACKGROUND

### *Wardship Petition and Transfer Motion*

In April 2021, the People filed a petition alleging Davion comes within the juvenile court's jurisdiction under section 602, along with a motion to transfer Davion's case to criminal court pursuant to section 707. According to the petition allegations, Davion was under the age of 18 when he committed two violations of the law: murder with malice aforethought of Gabriel O. (Pen. Code, § 187, subd. (a), count 1); and attempted second degree robbery of

4

Gabriel O. (*id.* at §§ 211, 644, count 2). As to each count, the People alleged Davion personally and intentionally used and discharged a firearm causing great bodily injury and death (*id.* at § 12022.53, subds. (b), (c), (d)), making each violation a serious felony (*id.* at § 1192.7, subd. (c)(8)), and a violent felony (*id.* at § 667.5, subd. (c)(8)).

In May 2021, Davion denied the petition allegations, and the court ordered the probation department to prepare a report. A hearing on the transfer motion was continued multiple times and finally set a year later, in May 2022. Meanwhile, the probation department filed two reports.

***Probation Reports***

A June 2021 report prepared by Ayesha Wilder contains a summary of the alleged crimes and of evidence incriminating Davion, which includes video of him drawing a gun and shooting the victim. The report also contains information gleaned from San Joaquin County probation records, where Davion had been declared a juvenile ward at age 14, for the misdemeanor of receiving stolen property. Davion's performance on probation was poor, as evidenced by 15 arrests and 10 sustained violations. In May 2019, he was sent to the county's camp program in lieu of a commitment to the Division of Juvenile Justice (DJJ), in order to provide a more structured program and keep him near family. But three times he was terminated from camp due to behavior issues. The first two times he was ordered to restart the program, but after failing for the third time he served his remaining custody time at juvenile hall, where he received 26 negative incident reports. A probation violation alleged in October 2020 was dismissed by San Joaquin County after learning of the pending case.

Wilder attached to her report, an "edited" chronology of Davion's criminal history. The attachment shows that when Davion was 11, a charge

5

that he committed battery was closed on intake. The following year, before Davion was declared a ward, a petition alleging felony assault with a deadly weapon and attempted second degree robbery was dismissed, with records sealed. The attachment lists multiple other incidents occurring during the wardship, many involving felony charges, with minimal details.

The probation report contains some information about Davion's family and community background. Social services in Solano and San Joaquin had received referrals about the family, but all were deemed unfounded, inconclusive, or evaluated out. Davion's parents did not respond to Wilder's inquiries, and the department did not obtain Davion's school records before Wilder prepared her report. Wilder obtained social history information by interviewing Davion.

Davion denied any gang affiliation, although he was known "to associate with identified street gang members." He reported no concerns about his substance use, but acknowledged smoking marijuana from the age of 10 and regularly using ecstasy and Percocet. Davion expressed a belief that he suffers from depression and reported experiencing suicidal ideation since age 14. He denied ever suffering any type of abuse. His parents were never married, and he has lived primarily with his mother and younger siblings. He reported having a good relationship with his mother, although San Joaquin records described their relationship as volatile. He was not close with his father, and mentioned a stepfather who struggled with addiction. Davion told Wilder that he had been homeless and staying with friends since his mother lost her job, but that she continued to provide financial support for him.

The probation report includes the department's recommendation to retain juvenile jurisdiction over Davion, based on its assessment of the five

6

criteria in section 707(a)(3), and its view that Davion's delinquent history is the only criterion weighing in favor of a transfer. As to all other criteria, Wilder acknowledged problematic behaviors, but opined they were outweighed by mitigating factors. Recommending the court find that Davion could be rehabilitated prior to expiration of juvenile jurisdiction, Wilder reported that a 2019 psychological evaluation conducted during the San Joaquin wardship indicated Davion would benefit from a structured environment, anger management training, and mental health services. Considering the totality of the circumstances, the department believed Davion could benefit from intervention through the Juvenile Justice system and a commitment to the DJJ.

On May 22, 2022, the department filed an addendum report, prepared by Wilder after she reviewed additional documentation. The department acknowledged that Davion had previously been afforded opportunities for treatment, but it believed he could still benefit from juvenile services, and that there was sufficient time to provide meaningful services before jurisdiction expired. Thus, it renewed its recommendation that Davion remain under the jurisdiction of the juvenile court.

### *Transfer Hearing*

The transfer hearing began on May 23, 2022, with the parties presenting evidence over multiple non-consecutive court days until August 26. The People called witnesses who testified about Davion's juvenile criminal history and his involvement in the alleged murder, the defense presented testimony about services available through DJJ, and both parties elicited testimony from their psychology experts.

7

***Witnesses Working Within the Juvenile Justice System***

<u>Probation Officer Duran</u>:  During the San Joaquin wardship case, Davion was twice placed on probation under the supervision of his probation officer on campus, Mr. Duran.  Duran testified that Davion became a juvenile ward at age 14 due to a shoplifting incident.  Davion and two other youths stole a USB charger from a Staples store.  On their way out, Davion held his hand behind his back in a manner suggesting he was armed with a weapon, and threatened to " 'do something' " to the employees if they called 9-1-1.

After Davion was declared a ward, Duran supervised him from September 2018 until May 2019.  During that period, Duran believed that when Davion was out of custody, he was complying with the terms of his probation, other than when he "obviously" violated the law.  In October 2018, Davion incurred a probation violation for an arrest in Stockton.  He was detained in juvenile hall for approximately two weeks, where he incurred several incident reports.  In November, he entered a plea to felony grand theft and was released.  In February 2019, Davion had another probation violation and was returned to custody after he was arrested on charges of robbery, grand theft, making criminal threats, intimidating a witness or victim, and assault and battery.  Duran supervised Davion while he was detained at juvenile hall, where he incurred more than 50 incident reports.  After the violation was adjudicated, Davion was sent to Camp Peterson and supervised by a different probation officer.

After Davion was released from camp and custody, he was reassigned to Duran, who supervised him from January 2020 until October 2020.  Due to the COVID pandemic, several program requirements were suspended or put on hold.  During this period, Davion had additional police contacts, although charges were either dismissed or not filed.  He served a brief period in

custody in June and incurred incident reports for fighting, possessing contraband, and mistreating staff. On October 25, Davion was arrested for breaking into cars. His probation term was extended, and he was released on an ankle monitor. After incurring 10 communication failures with respect to the monitor, Davion failed to appear for hearings in November 2020, February 2021, and April 2021. An arrest warrant issued on the third nonappearance was pending when San Joaquin was notified about the current charges and closed its case.

Probation Supervisor Chiong: Chiong is the director of the Camp Peterson program in San Joaquin County. When Davion attended the camp in May 2019, Chiong had daily contact with him. Chiong identified spreadsheets documenting violations Davion suffered and progress he made while at the camp, which were admitted into evidence. Davion frequently engaged in rude and disruptive conduct, and was not receptive to counseling. He started at the camp on May 2, and by May 14 he had already received 22 "hold-over days" due to his behavior. On May 14, he received a rules violation for a fight that was also filed as a probation violation. He was moved to juvenile hall, admitted the violation, and was returned to camp on May 23. Davion continued to incur rule violations, was counseled, and was referred for mental health services. On July 5, he was charged with a probation violation for pushing another youth, insulting staff, and being unreceptive to counseling. By that time, Davion had 24 incident reports, two contraband reports, and three unit disturbances, and the camp recommended that he restart the program. After serving a week at juvenile hall, Davion restarted the program on July 12, subject to periodic reviews by the court. Davion incurred violations daily, and on July 26 the court suspended him from camp. Davion returned to juvenile hall, where he continued to incur

9

violations, and eventually the court deleted the camp program and kept Davion at juvenile hall until his release from custody.

DJJ Liaison Custino:  Custino is a parole agent and court liaison, who was called to testify by the defense.  Custino testified that all DJJ facilities were expected to be closed as of June 30, 2023, and participants who had not completed their program by that time would be returned to their county of commitment.[1]  In the meantime, a minor charged with committing first degree murder at age 17 could potentially be committed to the DJJ, if he or she was the subject of a transfer motion.  (See § 736.5, subd. (c) [pending final closure of the DJJ, court may commit a ward who is otherwise eligible to be committed under existing law and in whose case a motion to transfer the minor from juvenile court to a court of criminal jurisdiction was filed].)

Custino described programs and interventions provided at DJJ, including aggression interruption training, cognitive behavioral interventions, skills training, mental health treatment, education and vocational programs, and a reentry program.  There are no specific gang interventions offered by DJJ, but there are services to address negative peer influence.

Solano County Probation Officer Wilder:  Wilder has been a probation officer for more than 20 years, but she testified that she had little experience working in the juvenile system, and had not supervised juveniles.  She had prepared only one transfer report and acknowledged knowing "very little about [the] process."  When she prepared Davion's report, she realized that

---

[1]  Probation supervisor Chiong testified that Camp Peterson would function as San Joaquin County's replacement for DJJ.  Chiong described Camp Peterson's program, which implements "evidence-based practices," by providing programs, classes and groups that include anger management, substance abuse, and social skills.

she had incomplete information. Although she reviewed additional documents after filing the initial report, she did not attempt to follow up with Davion's mother. She interviewed Davion only once, and did not ask him about the current charges. Her notes from the interview include a list of questions, many of which she either did not ask, or for which she did not record answers.

Wilder acknowledged that the prosecutor notified her that the delinquency history attached to the probation report was incomplete and inaccurate. The prosecutor provided Wilder with documentation showing Davion was the subject of more than 100 incident reports in San Joaquin County, and gave her a chart detailing Davion's prior police contacts. That chart was admitted into evidence after Wilder confirmed its accuracy. Wilder testified that she received additional relevant information from the prosecutor, including documentation of services and treatment afforded to Davion, and of "possible gang activity." Initially, Wilder refused to update her report and recommendations in light of this additional evidence unless ordered to do so by the court, but when the "directive" from her department changed, she prepared an addendum.

Wilder testified that, even after considering additional evidence, her department's recommendation was still to retain juvenile jurisdiction, based on the totality of the circumstances. She acknowledged Davion has already been offered the extent and caliber of services available through DJJ, but took the position that those services have not been afforded, reasoning that Davion did not engage in services when they were offered previously or have the same length of time to complete the programs. Wilder expressed that if there is even a one percent chance of rehabilitation, she would recommend retaining juvenile jurisdiction over Davion.

11

***Police Officer Witnesses***

Fairfield Detective Loewe:  Loewe was the lead detective in the investigation of the homicide of Gabriel O.  He described the crime scene, a parking lot on Grand Circle, where he observed a car containing two bullet holes, a spent shell casing near the car, and a bullet fragment embedded in the passenger seat.  Gabriel, who was sitting in the driver's seat, died from a gunshot wound to the chest.  Loewe interviewed Gabriel's girlfriend, who witnessed the crimes.  She reported that when they arrived at the parking lot, two individuals dressed in black accosted Gabriel, one pointed a gun at him and the other told him to turn over his money.  The person with the gun shot Gabriel when he tried to back up their car and continued shooting as the vehicle was backing up.  Police recovered surveillance video from the parking lot and surrounding area, which showed two assailants meeting with a third person before the crime, and also recorded those two individuals when they subsequently accosted Gabriel in the car and shot him.  Portions of the video were played during the transfer hearing.

Loewe, who had worked in the police gang unit, and another detective recognized Tereak Pray as the non-shooter in the video.  Initially, officers suspected another individual was the shooter, but that person reported that Davion was the shooter, and produced photographs of Davion that appeared to match the video.  Loewe's team obtained additional evidence pointing to Davion, including Instagram video recorded shortly before the shooting that was posted on Pray's account, and input from Stockton Police Detective Kestler, who is familiar with gangs in Stockton, where Davion lived.  After Davion was arrested in April 2021, Loewe did not interview him because he was a minor, but Loewe saw Davion in person and concluded that Davion was

the shooter in the surveillance video. A subsequent test of Davion's DNA was a positive match for DNA found on the victims' car.

Loewe testified about evidence collected from Davion's social media, which showed that Davion had learned someone identified him as the shooter and called that person a rat. Police also recovered photos from social media and cell phones that show Davion holding guns and flashing gang signs. And they obtained information that, five years before Gabriel was killed, Davion and Pray committed an attempted robbery together in approximately the same location. Loewe testified that at the time of Gabriel's shooting, Davion was a minor, while Pray and the other person implicated in the crimes were adults.[2]

Stockton Police Detective Kestler: The court qualified Kestler as an expert regarding criminal street gangs in Stockton. Kestler testified that the Nightingale EBK (everybody killa) gang was formed in the 1990's and was validated as a criminal street gang in January 2005. Nightingale EBK claim territory in southeast Stockton; their primary activities are committing robberies, burglaries, shootings, and murder; and several members produce rap music about criminal activity.

Kestler testified that Davion has been a validated member of the Nightingale EBK gang since November 15, 2019. Kestler knows Davion personally. He has contacted and surveilled Davion on the street, personally investigated him, monitored his social media and music, and read police reports that concern Davion. Kestler testified about multiple incidents

_____

[2] Wilder testified that when the charged offenses were committed, Davion was four months shy of his 18th birthday and Pray was 19 years old. We find no evidence about the age of the third assailant, other than Detective Kestler's testimony that he was an adult, but appellant's counsel appears to acknowledge he was a young adult.

13

involving Davion and the Nightingale gang that occurred before Davion became validated as a gang member. In December 2018, Davion and a gang member committed an armed robbery on the street, with Davion pointing a gun at the victim. A few weeks later, Davion saw the victim at a Burger King and threatened to kill him for reporting the incident. Another incident involved an April 9, 2021 traffic stop, when Davion and two validated gang members were found in the vehicle along with firearm magazines and ammunition. During that incident, Davion was arrested on an outstanding warrant.

Kestler's most recent contact with Davion occurred on April 22, 2021. Kestler and his partner were conducting surveillance outside the address of a Nightingale EBK member, when they spotted Davion in a passing vehicle. Knowing a warrant to arrest Davion had been issued in the present case, officers attempted to conduct a traffic stop of the vehicle, and a chase ensued until the vehicle met a dead end. Two occupants were arrested, but Davion fled on foot, dropping on the street a loaded rifle with the safety switch off. Subsequently, officers also recovered a handgun that was traced to the vehicle.

Kestler had reviewed incident reports from San Joaquin juvenile hall, which contained further evidence of Davion's gang affiliation, including an attempt to intimidate a rival gang member, displaying his affiliation through graffiti-style writing and hand gestures, and more than 10 fighting incidents. Kestler also reviewed social media accounts attributable to Davion and other gang members on which Davion was tagged in photos and videos with his moniker, " 'MadMaxx.' " Material that was admitted into evidence showed Davion performing rap music with other gang members, displaying gang signs and holding guns. In material posted after Davion's arrest for the

14

current offense, he used the terms " 'snitchK' " and " 'freeme' " to describe himself as "being a snitch killer" and wanting to be released from custody. Just one week before the transfer hearing, he posted a playlist to YouTube taunting a rival gang.

### Expert Psychologists

Dr. <u>Anthony Urquiza</u>: Dr. Urquiza is a licensed psychologist, university professor, and director of a child abuse and mental health treatment program at UC Davis Medical Center. The court qualified Urquiza to testify as an expert in the following areas: "Child abuse and trauma, including the impact of trauma on youth; adolescence and child clinical psychology; analysis of juvenile cases for transfer; and the training and development of treatment programs for youth." Urquiza was retained by the People to provide expert opinions regarding Davion's transfer petition. Urquiza asked to interview Davion, but was denied permission. He reviewed material pertaining to Davion's history and prepared a report documenting his opinion that Davion's case should be transferred.[3]

During his hearing testimony, Urquiza addressed the five statutory criteria for evaluating whether to transfer a minor to adult court. (§ 707(a)(3).) In assessing a minor's criminal sophistication, Urquiza looks for evidence of patterns in the minor's history of planning, motivation, and efforts to avoid detection. Urquiza testified that this factor weighs in favor of transfer based on the circumstances of the current murder, viewed in the

---

[3] After this appeal was fully briefed, the People filed a motion to augment the record with a copy of Urquiza's report. We reject the People's contention that they have established good cause for this untimely request, but we shall grant the unopposed motion to augment the record to include Urquiza's March 2021 report, which was admitted into evidence at the transfer hearing.

context of Davion's criminal history. Davion used a gun to commit robbery, as he had done many times before; he attempted to hide his identity and changed his clothes; he disposed of the gun; and there is evidence his motivation for committing crimes relates to his peer group.

Urquiza testified that factors pertaining to Davion's social background do not diminish his criminal sophistication. Prior trauma associated with social issues could be an indication of unsophistication if there was an isolated incident, but not in this case, Urquiza opined, because "[t]his is not a single robbery with a gun. This was a pattern of behavior that he's developed over time that has been important and instrumental to his life." Moreover, Urquiza believes that lack of maturity attributable to adolescent brain development is a condition that pertains to the general population of youthful offenders, and does show that Davion was less sophisticated than his circumstances otherwise show.

Regarding likelihood of rehabilitation prior to expiration of juvenile jurisdiction, Urquiza testified that it would be "[v]ery difficult" to treat Davion, given his conditions. He explained that there are effective treatments for addressing past trauma and conditions like depression, but not for changing a person's character or personality so that they will make better decisions, and he expressed the opinion that it is "incredibly difficult" to "start" making these types of changes at 18 years of age. There was evidence Davion had both a conduct disorder and a substance abuse disorder and, while each of these conditions is difficult to treat on its own, "combined, they're even more difficult." A person's active involvement in a negative peer group, like a gang, would be a further "contributor to a poor prognosis." Urquiza testified that as a mental health professional he believed everybody can benefit from treatment in some form, and he refused to say categorically

16

that Davion "cannot be rehabilitated," but he repeated that rehabilitation would be "extremely difficult," and "tremendously unlikely" or "extremely unlikely." Davion's problems would be extremely difficult to treat successfully even absent exacerbating factors, Urquiza opined, and here, there are exacerbating factors including: Davion's active involvement in a negative peer group; his refusal to engage in services offered to him in the past; and evidence that during his current detention, Davion continued to display a pattern of disruption, defiance and threats of physical aggression.

Urquiza opined that Davion's juvenile criminal history also weighs in favor of a transfer. The hundreds of incident reports documenting Davion's delinquent conduct are remarkable, as compared to other transfer matters in which Urquiza has consulted. Urquiza does not believe Davion's criminal history should be discounted because of his family and community environments and past traumas, as those experiences are part of "the body of incidents that have occurred over several years" upon which Urquiza bases his opinion that Davion's criminal history "is a reflection of his personality or his character and is part of who he is."

Prior unsuccessful attempts to rehabilitate Davion also weigh in favor of transfer, Urquiza testified. He based this opinion on evidence that Davion had received almost 10 years of services, from school, at juvenile hall, and as directed by the juvenile court.

Finally, Urquiza's opinion that Davion should be transferred to adult court includes consideration of the circumstances and gravity of the current offense. That crime resulted in a death, and the "issue of circumstances really is just this pattern of behavior that [Davion] has engaged in over the last several years of his life," Urquiza testified. The current offense involved carrying a firearm in pursuit of illegal activity, which is part of Davion's

17

pattern—carrying a firearm during prior reported incidents, threatening victims with firearms, and holding firearms in photographs that are posted to the internet.  In considering the circumstances of the current offense, Urquiza found that Davion's developmental experiences, school and behavioral problems, and criminal history are all a cumulation of things weighing in favor of transferring him to adult court.

Under cross-examination, Urquiza agreed that it would be difficult but possible to rehabilitate Davion.  One aspect of this issue pertains to timing— whether Davion can be rehabilitated during the period of juvenile jurisdiction.  The answer to this question does not hinge exclusively on resources and funding, but also "concurrently" the effort by Davion to "be able to meaningfully participate in the services that are offered," Urquiza testified.  Urquiza also acknowledged that brain maturation can contribute to an individual's development and ultimately lead to reduced aggression and less impulsivity.  Urquiza testified that one might argue Davion made an impulsive decision to fire a gun during the current offense, but his decision to carry a gun "happened before the actual shooting," and is consistent with his "pattern of having done it many times before."

<u>Dr. Rahn Minagawa</u>: Dr. Minagawa is a licensed clinical psychologist and educator.  The court qualified him to testify as an expert in "clinical and forensic psychology," with special expertise in "child and adolescent psychology and development, substance abuse, gang-involved youth, and developmental aspects of trauma."  At the request of the defense, Minagawa conducted a psychological evaluation of Davion and submitted a written report, based on interviews and testing of Davion conducted in August and

18

September 2021, a telephone interview with Davion's mother, and a review of documents supplied by defense counsel.

Minagawa's report was admitted into evidence at the transfer hearing. It states that Davion was raised in a "severely dysfunctional home environment," as he experienced food and housing insecurity, witnessed his mother being attacked by her on-and-off boyfriend, and was himself a victim of physical and emotional abuse. According to Minagawa, Davion self-reported abuse by recalling occasions when he witnessed his mother's boyfriend hit her, and that the man also punched and hit him, and Minagawa opined that Davion had previously denied abuse because he misperceived his own experiences. Also, Minagawa discounted mother's report that the family "didn't really have issues with food," as Davion had reported that he shoplifted because he was hungry. And although social service referrals had been deemed unfounded, they are evidence of neglect in Minagawa's opinion.

Minagawa also reported that Davion has been exposed to community violence based on his reported experiences. Davion remembered hearing sounds of gunfire from the age of 10, and was jumped when he was 12. He witnessed other acts of violence and lost people to gun violence. He also witnessed gang activity in the community and at school. Although some of his friends were involved in gang culture, Davion denied personally participating in gang activity. He acknowledged that he was "an angry kid" and " 'just bad,' " and that he struggled in school. But since being detained on the current charges, he obtained a high school diploma, which Minagawa viewed as evidence of a capacity for growth and maturity.

Minagawa reported that, at some unspecified time, Davion became associated with the Head Niggas In Charge (HNIC) street gang. His friend and codefendant Tereak Pray is a documented member of that gang. Davion

19

has known Pray since the two attended elementary school together, and they used to call each other cousin. Davion reported that his mother did not like Pray, who was " 'hella bad' when he was a kid," but Pray had been " 'cool with' " Davion prior to the instant offense.

Minagawa also reported that Davion has an extensive juvenile criminal history, noting that Davion's first arrest at age 12 for assault with a deadly weapon and attempted robbery pertained to an incident when he and Pray used a pellet gun to rob people. While detained for the current offenses, Davion continued to struggle with his behavior, receiving eight write-ups for profanity, kicking and banging doors, and disrespectful conduct, but he had "not engaged in any acts of physical violence," Minagawa reported.

Minagawa diagnosed Davion with multiple conditions. His primary diagnosis is a conduct disorder, onset during childhood and not confined to the classroom setting. Based on Davion's self-reporting during his interview and testing, Minagawa also diagnosed Davion with cannabis and opioid use disorders, a "generalized anxiety disorder," and child physical abuse and neglect.

In his report, Minagawa offered his opinion that Davion should remain under the jurisdiction of the juvenile court based on Minagawa's consideration of the five criteria in section 707(a)(3). He acknowledged "Davion's level of criminal sophistication is not insubstantial," but opined that this factor weighs in favor of retaining juvenile jurisdiction due to what he called Davion's young age at the time of the current offenses, which shows that Davion is still in the process of adolescent brain development. Moreover, Davion has a potential for growth and maturity that will not take a positive direction if he is transferred to adult court, Minagawa opined. Minagawa acknowledged Davion's prior delinquent history is significant, and the one

20

criteria that could support a transfer order, but he urged the court not to take that path.

During his hearing testimony, Minagawa confirmed the opinions in his report. Additional information about Davion's behavior that was "brought to light" later did not alter Minagawa's opinion that, based on all the factors the court may weigh in ruling on a transfer petition, Davion should remain under the jurisdiction of the juvenile court. Minagawa concurred with the Solano probation department's recommendations and disagreed with Dr. Urquiza. Specifically, Minagawa opined that Davion's criminal sophistication is reduced because he was influenced by adult, familial, and peer pressure, and that Davion's drug use and other social and environmental factors impacted his development. Minagawa also opined that Davion is too young to be diagnosed with a personality disorder, and that his conduct disorder behaviors are treatable.

Under cross-examination, Minagawa acknowledged that Davion meets the diagnostic criteria of a person with an antisocial personality disorder, but maintained that such a diagnosis should not be made unless the behaviors continue into adulthood. Minagawa also acknowledged that his opinions about the impact of trauma on adolescent brain development are not based on scientific studies. He has testified at more than 80 transfer hearings and never offered an opinion that a minor should be transferred to adult court.

***The Juvenile Court's Ruling***

On March 13, 2023, the court ordered that Davion's case be transferred to criminal court.[4] The detailed order was made in open court and

___

[4] After the evidence phase of the hearing, there was a delay of several months before the court made its ruling. In the interim, the court and counsel discussed the fact that the Legislature had amended section 707, and

transcribed by the court reporter. In framing the issues, the court pinpointed the 2023 amendments, i.e., that the prosecutor's burden of proof had changed from preponderance of the evidence to the clear and convincing standard of proof, and that in order to transfer a matter to a court of criminal jurisdiction, the juvenile court "shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." Then the court addressed separately the five section 707(a)(3) criteria.

### *Criminal Sophistication*

The court found Davion's criminal sophistication weighs in favor of granting the transfer motion. It based this finding on the totality of the circumstances, but emphasized four factors. First, Davion's role in the charged offenses reflected sophistication. He participated in a planned robbery during daylight hours in a residential neighborhood, changed his clothes and wore a hood to conceal his identity. And he brought a firearm to the robbery, which he used to shoot and kill the victim. Second, Davion has an "extensive criminal history," having incurred 10 adjudications or sustained probation violations since he became a ward of the court at age 14. This history includes "repeated" arrests for robbery, "some involving the use of weapons." Third, Davion is a validated member of the Nightingale EBK street gang since 2019. Fourth, Davion's social media posts while incarcerated at the juvenile detention center in connection with this case show that he "appreciates the risks and consequences of his criminal actions."

In making a determination of criminal sophistication, the court considered Davion's age and mental and emotional health at the time of the

---

agreed the 2023 amendments would apply retroactively. Accordingly, the court delayed its ruling and decided the motion under the amended statute.

22

alleged murder. Explaining why these factors did not evince a lack of sophistication, the court observed that Davion reported experiencing "suicidal ideations" on two occasions—when he was 14, and then again when was incarcerated in juvenile hall for the first time. Neither occasion was around the time of the charged offense, and Davion had also reported that he was not actually suicidal but was trying to get his mother's attention. There was also evidence Davion's family experienced periods of financial hardship and was referred to social services, but the court observed that none of the referrals involved allegations of abuse and, although Davion may have been exposed to adverse childhood events, none of his siblings had problems with delinquency.

The court emphasized that Davion's criminal sophistication is not limited to the current offense. For example, his school records "indicate over 128 disciplinary actions" between second and tenth grade, which include fighting and violence, bullying, threats, defiance, theft and substance abuse. He was suspended from elementary school for pulling a knife, and expelled from high school for fighting. Moreover, the court found that the fact that Davion may have been exposed to domestic violence, homelessness, community violence, and family dysfunction does not mitigate the criminal sophistication he has displayed during the current offense, and his prior crimes.

### *Rehabilitation Prior to Expiration of Juvenile Jurisdiction*

The court concluded that it was unable to determine from evidence presented at the transfer hearing whether juvenile programs available in Solano County could address Davion's needs within the requisite time frame, before he turns 25. Therefore, the People failed to carry their burden as to this factor, the court found.

Explaining its reasoning, the court focused on Probation Officer Wilder. Rejecting the department's recommendation to find there was sufficient time to rehabilitate Davion prior to the expiration of the court's jurisdiction, the court faulted Wilder for failing to author a new probation report after receiving additional documentation. The court also observed that the department relied on a 2019 psychological evaluation conducted when Davion was in San Joaquin County, and yet Wilder failed to report the evaluator's opinion that Davion's "inability and lack of awareness of or willingness to conform to rules and norms make his behavior especially concerning in that it is less likely he will respond appropriately to treatment." The court stated that it also considered the experts' opinions, which were conflicting.

The court found that if Davion's case remained in juvenile court, he would likely qualify for a placement at DJJ. The court had heard a "significant amount of testimony" about services that could be provided through DJJ, but that program was closing. The People did not produce evidence about what services would be available at the county equivalent of DJJ, the RISE program, which was a new program with no track record. Accordingly, the court found that this criteria "mitigates in favor of not transferring [Davion] to adult court."

### *Prior Delinquent History*

The court found that the People met their burden of showing that Davion's delinquent history weighs in favor of a transfer. It summarized evidence pertaining to Davion's "extensive" history, which includes eight arrests for felony robbery, as well as arrests for receiving stolen property, assault with a deadly weapon, conspiracy, assault likely to produce great bodily injury, criminal threats, dissuading a witness, vandalism, theft, possession of burglary tools, and multiple probation violations. The court

24

found that many incidents involved violence, threats of violence, and use of weapons to intimidate victims, and many of Davion's prior arrests involved gang members or associates. The court credited Detective Kestler's testimony that Davion has been a validated gang member since November 2019. It also relied on incidents at juvenile hall and Davion's refusal to participate in court-ordered services. Finally, the court observed that experts for both sides agreed that this factor weighs in favor of transfer.

### *Success of Prior Attempts at Rehabilitation*

The People did not carry their burden of proving that prior attempts to rehabilitate Davion in juvenile court is a factor that weighs in favor of the transfer motion, the court found. The court observed that Davion received extensive services from the school system, but expressed concern about the dearth of evidence about services that were afforded to Davion while he was on probation in San Joaquin County. In this regard, the court recalled Duran's testimony that Davion received services through the HUB program and completed part of that program before reoffending. When he was subsequently re-enrolled, he failed to attend, but when he was ready to attend, the program was placed on hold due to COVID. The court also considered Chiong's testimony about Camp Peterson, finding from the evidence that Davion appears to have had "a half month of actual programming" while at the camp. Although the court was aware that the camp offers rehabilitation services, it was not provided with "information regarding the actual programming [Davion] completed or refused to participate in while at Camp Peterson." As it was not clear to the court "what services the minor actually received" in San Joaquin County, the court concluded that this factor mitigates in favor of retaining juvenile court jurisdiction.

25

### *Circumstances and Gravity of Current Offense*

The court found the People met their burden to show that the circumstances and gravity of the current offense weighed in favor of a transfer to adult court. The court reasoned that the "current violation is the most serious and grave offense that exists," and found that Davion was "intimately" involved in the offense, as he "brought a firearm to the robbery and shot the victim." This was not a "spur-of-the-moment" interaction between Davion and the victim. The gravity of the offense was "exacerbated by the fact that the minor has been involved in previous robberies, some of which included firearms," and that he continued to commit crimes despite being afforded numerous probation opportunities. Moreover, the gravity of this offense was not mitigated by considering adversity Davion had faced, the court found.

In concluding its findings, the court stated: "Based upon the foregoing reasons, . . . the Court finds the minor, Davion [M.], was under the age of 18 at the time of the alleged criminal offense. He was 17 years old at the time. And the Court rules that the matter be transferred to adult criminal court." After an off-the-record discussion, the court supplemented its order by stating that its ruling was based on statutory factors "[o]ne, three and five," and "the totality of the circumstances, the extensive history the minor has with juvenile delinquency, as well as his continued arrests and violent behavior, also while in custody."

## DISCUSSION

"We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165; see *People v. Superior Court* (1995) 18 Cal.4th 667, 680–681.) Under this standard, "[t]he trial court's findings of fact are reviewed for substantial evidence, its

26

conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence." (*Miguel R.*, at p. 165.) "Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' " (*Ibid.*) Because the court must make that finding by clear and convincing evidence, we " 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Ibid.*)

## I. The Transfer Order Is Supported by the Evidence

Davion challenges the sufficiency of the evidence to support the juvenile court's ultimate finding—that Davion is not amenable to rehabilitation while under the juvenile court's jurisdiction—by presenting a two-part argument. Specifically, Davion argues that the court was required to find him amenable to rehabilitation while under the court's jurisdiction because (1) both experts agreed he could be rehabilitated, and (2) the People failed to produce evidence of what services would be available if juvenile jurisdiction was retained. We address separately the flaws in each prong of this argument.

First, Davion's contention that the experts agreed he could be rehabilitated misconstrues the testimony of the People's expert. Dr. Urquiza testified unequivocally that in his opinion, all five section 707 criteria support finding that Davion's case should be transferred to adult court. In addressing the criterion set forth in section 707(a)(3)(B)—whether the minor can be rehabilitated "prior to the expiration of the juvenile court's jurisdiction"—

Urquiza was unwilling to posit that Davion is incapable of rehabilitation, and he expressed a foundational belief that everyone can benefit from treatment. Nevertheless, Urquiza opined that this criteria supports transferring Davion's case because the type of problems Davion exhibits would be extremely difficult to treat in juvenile court, and also because of aggravating factors specific to Davion, including his refusal to engage in services offered to him in the past. As a result, Urquiza opined that successful rehabilitation would be "tremendously unlikely."

Davion takes the position that Urquiza necessarily admitted that Davion is amenable to rehabilitation in the juvenile system by acknowledging that rehabilitation is "possible." We are unpersuaded by this argument. In common parlance, amenable to rehabilitation does not mean that rehabilitation is conceivable. Amendable can mean "able to be . . . affected by something," but it also carries the meaning of "readily yielding," "hospitable," or "suitable." (Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/amenable> [as of Nov. 21, 2024].) Like the *Miguel R.* court, we think the ultimate finding of amenability to rehabilitation requires of the juvenile court "a global assessment of the minor's *suitability* to rehabilitation within the juvenile court system" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 167; italics added), not a mere acknowledgement that, as with any human being, rehabilitation is possible. Reducing amenability to mere possibility, as Davion does, conflicts with the legislative directive that the ultimate determination of a minor's amenability to rehabilitation in the juvenile system requires consideration of multiple criteria and a panoply of potentially relevant factors.

Davion mistakenly relies on *Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709. In that case, which was decided under a much earlier version

of section 707, the Supreme Court held that a juvenile court erred by certifying a 17-year-old minor for trial in adult court without considering multiple relevant factors. One such factor was whether the minor could be treated through the facilities of the juvenile court. The juvenile court in *Jimmy H.* purported to rely on this factor, but failed to actually consider it or other pertinent factors, the Supreme Court found. (*Id.* at pp. 712–713, 716.) In reaching its conclusion, the court observed that expert testimony that a minor can be treated through the facilities of the juvenile court is "entitled to great weight in the court's ultimate determination" as to the fitness of a minor for treatment as a juvenile, although such testimony is not conclusive. (*Id.* at pp. 714–715.) *Jimmy H.* does not assist Davion. First, Davion's case is factually distinguishable, as here the experts disagreed about whether Davion is amenable to rehabilitation while under the jurisdiction of the juvenile court. Urquiza's testimony was evidence in support of the judgment, even as Minagawa disagreed with it, and was only part of the substantial evidence upon which the juvenile court relied. Second, and in any event, *Jimmy H.* does not hold or intimate that "amenable" means merely possible.

Turning to the second prong of Davion's sufficiency of the evidence argument, he contends that the transfer order conflicts with the juvenile court's express finding that the People failed to produce evidence of what services would be available to Davion if he remained under the jurisdiction of the Solano County juvenile court. Again we disagree, as this time Davion conflates two distinct findings the court must make. In concluding that the second criterion set forth in section 707(a)(3) mitigated in favor of retaining jurisdiction, the juvenile court found that the People failed to meet their burden of proof by producing concrete evidence regarding the type of services that would be available in the county after the DJJ closed down. That

29

finding, however, was distinct from the court's ultimate finding regarding Davion's amenability to rehabilitation while under the jurisdiction of the juvenile court. As discussed, the ultimate finding required by section 707 depends on a consideration of all five statutory criteria and, importantly, the juvenile court has discretion to determine that one or more criteria predominate. (*E.P.*, *supra*, 89 Cal.App.5th at p. 417.)

The dearth of evidence about what services would be available at the county level once the DJJ closed was not dispositive in the juvenile court's analysis because Davion's lack of amenability to rehabilitation in the juvenile delinquency system was established by three other statutory criteria: his criminal sophistication, his juvenile delinquency history, and the gravity and circumstances of the current offense. Davion does not dispute that the court's findings as to those criteria are supported by substantial evidence. Moreover, accepting Davion's contention that there is undisputed expert evidence that he could benefit from juvenile services does not mean the juvenile court erred by granting the transfer motion. First, the fact that Davion may benefit from services in the juvenile justice system, such that he moves in the direction of rehabilitation, does not mean that he will fully achieve that goal. Urquiza was unequivocal that he considered rehabilitation "tremendously unlikely" within the time available to Davion in the juvenile justice system. Second, "the existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence. In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 169.)

In his reply brief, Davion argues for the first time that the prosecution's failure to carry its burden of proof as to two of the five statutory criteria establishes unequivocally that "it would be impossible to find the prosecution

30

proved by clear and convincing evidence that Davion was not amenable to rehabilitation while under the court's jurisdiction." Davion cites no authority supportive of this view, a version of which was expressly rejected in *Miguel R.*, *supra*, 100 Cal.App.5th at pages 165–166. The *Miguel R.* court held that a finding that the People failed to carry their burden to show that the minor could not be rehabilitated prior to expiration of juvenile jurisdiction was *not* incompatible with the juvenile court's ultimate determination that the minor was not amenable to rehabilitation while under the jurisdiction of the juvenile court. (*Ibid*.) "[T]he focus of the second criterion is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction," whereas the ultimate question of a minor's amenability to rehabilitation "requires the court to consider . . . other reasons why the minor might or might not be responsive to the available rehabilitative services." (*Id.* at pp. 166–167.) We agree with *Miguel R.*, a case Davion fails to address, and reach the same conclusion here.

## II. The Juvenile Court Stated Reasons Supporting Its Decision

As noted, section 707(a)(3) states that when a court orders a case to be transferred to adult court, "the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (See also Cal. Rules of Court, rule 5.770(c).) Davion contends the juvenile court failed to comply with this requirement, necessitating a remand and further proceedings. We disagree. The court's ruling, announced on the record at the March 2023 session of the transfer hearing, consists of a 24-page order that details the court's reasons for finding that three of the five statutory criteria weigh in favor of granting the transfer motion.

31

Davion purports to show that the juvenile court failed to provide adequate reasons by focusing on one of the five statutory criteria, section 707(a)(3)(A), which requires the court to consider the "degree of criminal sophistication exhibited by the minor." Davion concedes that the juvenile court did give reasons for its decision as to this criterion, in the sense that it identified evidence and factors upon which it relied, it explained why it favored some testimony over other evidence, and it explained why it discounted some evidence. Davion contends, however, that the court's reasons were deficient because it did not focus on the ultimate question whether Davion was amenable to rehabilitation. We disagree. By legislative design, the section 707(a)(3) criteria are focused on the ultimate question before the court and, in addressing each of these criteria in its detailed order, the court was focused on this ultimate issue.

Davion makes two substantive complaints about the juvenile court's analysis of the criminal sophistication criterion, both of which lack merit. First, he contends the court committed legal error because it did not focus on "the developing adolescent brain." Davion cites no authority requiring the juvenile court to address adolescent brain development as an overriding factor. Instead, he posits that the Legislature recognized that adolescent brain development is a reason for treating juvenile offenders differently from adult offenders. (Citing e.g., *S.S.*, *supra*, 89 Cal.App.5th 1277.) Indeed, that circumstance may have been a motivation underlying the 2023 amendments, but it is not a statutory factor that the court is required to separately address in its order. In this case, as discussed, the parties presented conflicting expert opinions about whether adolescent brain development was a mitigating factor as to Davion.

32

Second, Davion contends that when the court found that Davion exhibited criminal sophistication, it recited "some" facts that are not supported by the record. We reject this veiled sufficiency of the evidence argument. Specifically, Davion disputes a statement in the court's order that Davion " 'appears to have planned the robbery with two other individuals.' " Davion overlooks evidence, including surveillance video, that shows Davion met with his cohorts before the robbery, then went to change his clothes and retrieve a loaded firearm, which he used to shoot the victim. Davion also faults the court for failing to "mention" that Davion's coparticipants were adults. If Davion means to say that adult participation in the charged offenses was a dispositive factor that undermines the finding of criminal sophistication, we disagree. The court explained in its order that it considered multiple factors in reaching its finding, including Davion's retrieval of a firearm and other evidence that went "beyond the immediate circumstances of this crime." Considered in its totality, the evidence of Davion's criminal sophistication is more than substantial. Indeed, Davion does not contend otherwise.

In his reply brief, Davion attempts to shore up this second ground for his appeal with a very general claim that the court committed prejudicial error because it failed to consider the facts of this case "through the lens of amenability as the amended statute required." As we have discussed, the 2023 amendments refocus courts on the ultimate issue of the minor's amenability to rehabilitation by raising the People's standard of proof and requiring a statement of reasons. (*S.S.*, *supra*, 89 Cal.App.5th at p. 1288.) Here, the record shows the juvenile court was aware of and complied with these new requirements, and in so doing the court *did* properly focus on the ultimate issue of whether Davion was amenable to rehabilitation while under

33

juvenile jurisdiction.  To the extent Davion disagrees with the court's factual findings, he fails to identify any finding that is not supported by substantial evidence, as we have discussed.  And, to the extent Davion disagrees with the manner in which the court weighed the relevant criteria, he does not show that the court abused its discretion.

**III.  2024 Amendments to Section 707 Do Not Require a Remand**

While this appeal was pending, section 707 was amended, effective January 1, 2024.  (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 156, 164; Sen. Bill No. 545 (2023–2024 Reg. Sess.).)  Both parties filed briefs after the 2024 amendments went into effect, but neither brief addresses whether the amendments are relevant to this case, or even mentions them.  Initially, we requested that the parties be prepared to address at oral argument whether the 2024 amendments have any bearing on our resolution of this appeal. However, after oral argument was continued at the request of Davion's newly retained counsel, we granted leave for the parties to file supplemental briefs addressing the relevancy, if any of the 2024 amendments.

As noted in the Statutory Overview section of this opinion, section 707(a)(3) requires that when the juvenile court evaluates statutory criteria pertinent to its transfer decision, it "shall" give great weight to "any relevant factor."  (§ 707(a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii)–(iii).)  This requirement was added by the 2024 amendments, as the previous version of the statute made consideration of relevant factors "discretionary, not mandatory."  (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164–165.)  The 2024 amendments also expanded the list of factors that are relevant to an assessment of the minor's criminal sophistication, to require a consideration of "whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been 'a victim of human trafficking,

34

sexual abuse, or sexual battery.' " (*Miguel R.*, at p. 165, quoting § 707(a)(3)(A)(ii).)  Whether the current offense was committed against a person accused of sexually abusing the minor is also a factor for the court to consider when evaluating the circumstances and gravity of the current offense.  (§ 707(a)(3)(E)(iii).)

Ameliorative provisions in the 2024 amendments apply retroactively to cases in which there is not yet a final judgment.  (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 169–170; see *S.S.*, *supra*, 89 Cal.App.5th at pp. 1288–1289 [finding that 2023 amendments applied retroactively].)  Nevertheless, we conclude that the 2024 amendments do not warrant a remand for the juvenile court to reconsider its ruling on the transfer motion.  The 2024 amendments make consideration of relevant factors mandatory, but there is no contention in this appeal that the juvenile court failed to consider a relevant statutory factor.  Further, although the new statutory factors—whether the minor was previously involved in the child welfare system; and whether the minor is a victim of prior sexual abuse—were not enumerated in the former statute, these factors were obviously relevant to other factors that were listed, thus giving the parties an "incentive to develop and present such evidence" at the transfer hearing, even though it was held before the 2024 amendments went into effect.  (*Miguel R.*, *at p.* 170.)

Moreover, the record here affirmatively shows that both of the newly designated relevant factors were considered by the parties and court during Davion's transfer hearing.  Davion denied ever suffering from sexual abuse, and record evidence about his personal and family background does not suggest otherwise.  Moreover, both parties presented evidence regarding social services' involvement with Davion's family, and the court considered that evidence when it evaluated whether Davion demonstrated criminal

35

sophistication.  Since the record shows these factors were considered, it is not reasonably probable the court would have reached a decision more favorable to Davion if it had applied the current version of section 707.  (*S.S.*, *supra*, 89 Cal.App.5th at p. 1289 [failure to apply § 707 amendments reviewed under state law harmless error standard]; *Miguel R.*, *supra*, 100 Cal.App.5th at p. 170–171 [following *S.S.*].)

In closing, we make one additional observation.  It appears the People's failures of proof on two of the five statutory factors made this a closer case than it needed to be.  We agree with the juvenile court that the People's failure to provide concrete evidence as to what programming the juvenile system could provide to Davion was a criterion that weighed against granting the transfer motion, as it would be improper for the court to use the absence of evidence regarding the availability of appropriate programing to justify a transfer order.  In a different case, a failure of proof on this second criterion could doom the government's transfer motion.  But here, the court found that Davion was not amenable to rehabilitation in the juvenile court *in spite of*, not because of, the government's failure to provide specifics about the programming it would offer when the DJJ closed.  The compelling evidence in this case on other criteria, including Davion's extensive history with the juvenile delinquency system, is substantial evidence in support of the ultimate finding that he is not amenable to rehabilitation through the juvenile court.

## DISPOSITION

The order transferring Davion to criminal court is affirmed.

                              TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Davion M.* (A167516)